IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:11-cr-00542-GEB |
| Plaintiff, | |
| v. | ORDER RE: RESTITUTION |
| JOSEPH CANTRELLE, | |
| Defendants. | |

A restitution hearing was held in this action on April 12, 2013. Relevant procedural history is recounted to provide background for the instant order.

### I. PROCEDURAL HISTORY

The factual basis for Defendant's guilty plea reveals that on October 26, 2011, an undercover FBI Agent signed onto a peer-2-peer file sharing program via the Internet and "observed numerous files had titles and thumbnails indicative of child pornography." (Plea Agreement 14:5-10, ECF No. 32.) "The FBI Agent downloaded thirty two image files and one video file . . . . Twenty nine of the thirty two image files depicted child pornography, as did the one video file." (Id. at 14:10-12.) On November 8, 2011, the FBI Agent again accessed a peer-2-peer file sharing program and "observed numerous files had titles and thumbnails indicative of child pornography." (Id. at 14:22-15:2.) "This time . . . [e]ighty-eight of the ninety one image files [downloaded]

appeared to depict child pornography, as did the one video file [downloaded]." (Id. at 15:2-5.) Defendant was subsequently identified in connection with the peer-2-peer file sharing program at issue. He was arrested and indicted, and on November 2, 2012, he plead guilty to a single count of distributing visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). (See Plea Agreement.) Defendant "admitt[ed] that on October 26, 2011, he knowingly distributed images of child pornography . . . ." (Id. at 15:24-16:5.)

The findings in Defendant's Presentence Report ("PSR"), which have been adopted, evince that files found on Defendant's computer were submitted to the National Center for Missing and Exploited Children ("NCMEC"), Child Victim Identification Program. (PSR ¶¶ 14-15.[1]) The NCMEC analysis identified "Vicky" and "Amy" as subjects of at least one of the images Defendant distributed. (Id. at ¶¶ 15-16, 18; Amy & Vicky's Br. Regarding Restitution 25 ("Victims' Brief"), ECF No. 60.) The United States Justice Department notified Vicky and Amy's counsel that Vicky and Amy were identified as victims in this action via letter on June 27, 2012. (Victims' Brief 4.)

On November 27, 2012, Vicky submitted a request for restitution to the U.S. Attorney's Office totaling $1,330,015. (Id.) On November 30, 2012, Amy submitted a request for restitution to the U.S. Attorney's Office totaling $3,367,854. (Id. at 5.) These restitution requests were transmitted to the United States Probation Office, which

---

[1] Since Defendant did not object to the findings in the PSR, the Court adopted them and "determine[d] them to be true and correct" at Defendant's sentencing hearing on February 15, 2013. (Rep. Tr. 2:7-12, Feb. 15, 2013, ECF No. 44.)

2

provided them to the undersigned judge for his review. (Id.; PSR ¶¶ 18-19.)

Probation did not recommend restitution in the PSR. (PSR ¶ 18.) Concerning restitution, the PSR states in full:

> [R]estitution is not recommended based on the Ninth Circuit ruling in U.S. v. Kennedy, 643 F.3d 1251 (9th Cir. 2011), which puts the burden on the Government to show that there is a causal connection between the defendant's criminal conduct and the harm to the victim(s). At this time, there is insufficient information to show that the Government has met its burden to allow for the imposition of restitution in this case. The Government may wish to set a subsequent hearing to allow the Court to make a determination on restitution.

(Id.) The government did not brief the restitution issue in advance of either of Defendant's February 15, 2012 or February 22, 2012 sentencing hearings.[2] And at Defendant's February 22nd sentencing hearing, the government's entire argument concerning restitution was as follows:

> [T]he government wanted to just verify with the Court whether the Court had received the two restitution packages from the attorneys for the Vicky series and the Amy series.
>
> The Court: Yes.
>
> Ms. Prince: Okay. And just wanted to state for the record that independent, that these attorneys have filed restitution claims for these two individuals, and are requesting the full amount of restitution, and the government submits.

(Rep. Tr. 4:20-5:4, Feb. 22, 2013.) The government's submission of these restitution issues, in light of Probation's statement in the PSR that the government had not met its burden on restitution, was tantamount to conceding that the government could not meet its restitution burden.

---

[2] Defendant's sentencing commenced on February 15, 2013, but was continued to February 22, 2013, due to the government's then counsel's illness. (Rep. Tr. 3:11-14, Feb. 22, 2013, ECF No. 42.)

3

Nevertheless, counsel for the government later inquired at the sentencing hearing whether "the Court [would] be ordering restitution in this case," and the undersigned judge "didn't order it . . . following the recommendation of the probation officer for the reasons stated in the [PSR]." (Id. at 7:21-8:1.)

Amy and Vicky filed a petition for writ of mandamus under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, challenging the denial of restitution to them. See In re Amy & Vicky, --- F.3d ----, 2013 WL 1197266, at *1 (9th Cir. 2013). Vicky and Amy contended in their mandamus petition that the undersigned judge "erred in applying United States v. Kennedy, 643 F.3d 1251 (9th Cir.2011)[, and] . . . erred in not awarding them any restitution." Id.

The Ninth Circuit held that there was no error "in imposing a proximate cause requirement when applying 18 U.S.C. § 2259(b)(3) . . . ." Id. However, the Ninth Circuit also held that it was an abuse of discretion "in refusing to order any restitution." Id. The Ninth Circuit stated:

> During the sentencing hearing, with respect to restitution, the district court adopted the [PSR's] recommendation. The PSR did not recommend restitution under Kennedy only because the writer of the report concluded that he lacked sufficient information to show that the Government had met its burden of establishing a causal connection. Our review of the record demonstrates that [Amy and Vicky] provided sufficient evidence to establish a causal connection between defendant's offense and [their] losses.

Id. "Accordingly," the Ninth Circuit granted Amy and Vicky's petition in part, ordered that the judgment "shall [be] vacate[d] with respect to restitution," and remanded the matter to "conduct such further proceedings as may be appropriate to determine an amount of restitution to be paid to Amy and Vicky." Id. at *1-2.

4

In accordance with the Ninth Circuit's opinion, "the judgment entered on March 6, 2013, [wa]s vacated only with respect to the determination concerning restitution[,]" and a hearing was scheduled regarding the restitution issues. (Am. Order, ECF No. 56.) Further, "each party and the Amy and Vicky victims [we]re requested to file a brief concerning the determination of an amount of restitution to be paid to Amy and Vicky consistent with the Ninth Circuit's . . . opinion and United States v. Kennedy . . . ." (Id. (internal quotation marks and brackets omitted).)

Each party, and Amy and Vicky (collectively "victims"), filed supplemental briefing concerning restitution. (See ECF Nos. 60-62.) Amy and Vicky also provided separate, supplemental restitution requests to the United States Attorney's Office, which were subsequently transmitted to the Probation Office and then to the undersigned judge.

Defendant objects to each victim's submission of "'updated' victim restitution" requests, arguing "[t]he new information" should "have [been] provided prior to the previous hearing." (Def.'s Brief 5:27-6:5.) Defendant's objection is overruled since the undersigned judge provided the victims with an opportunity to file *amicus curiae* briefs on the restitution issue. (Am. Order 1:20-2:2.) Although the undersigned judge did not contemplate that the victims would augment the record, doing so was within the ambit of the briefing opportunity provided. Further, it is evident that the government was permitted to augment the record. (See, e.g., PSR ¶ 18.)

## II. LEGAL STANDARD

18 U.S.C. § 2259 "makes restitution 'mandatory' for offenses involving sexual exploitation and other abuse of children." Kennedy, 643 F.3d at 1260. "The order of restitution must 'direct the defendant to

5

pay the victim . . . the full amount of the victim's losses.'" Id. (quoting § 2259(b)(1)). Section 2259 defines the phrase "full amount of the victim's losses." Id.

> "[F]ull amount of the victim's losses" includes any costs incurred by the victim for —
>
> (A) medical services relating to physical, psychiatric, or psychological care;
>
> (B) physical and occupational therapy or rehabilitation;
>
> (C) necessary transportation, temporary housing, and child care expenses;
>
> (D) lost income;
>
> (E) attorneys' fees, as well as other costs incurred; and
>
> (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3).

> [I]n order to award restitution under § 2259(b)(1), a district court must make three **determinations**: (1) that the individual seeking restitution is a "victim" of the defendant's offense, § 2259(b)(1),(c); (2) that the defendant's offense was a proximate cause of the victim's losses, . . . ; and (3) that the losses so caused can be calculated with "some reasonable certainty"

Kennedy, 643 F.3d at 1263 (emphasis added) (citations omitted).

The Ninth Circuit determined in the remand order that "the record demonstrates that [the victims] provided sufficient evidence to establish a causal connection between defendant's offense and [their] losses." In re Amy & Vicky, 2013 WL 1197266, at *1. Therefore, only the third Kennedy "determination" is at issue, i.e., the calculation of each victim's losses. See id. at *2.

The government bears the burden of "proving the amount of the victim[s'] losses . . . ." Kennedy, 643 F.3d at 1261 (citing 18 U.S.C.

6

§ 3664(e)). "In carrying this burden, . . . the government must provide the court with enough evidence to allow the court to estimate the 'full amount of the victim[s'] losses' with 'some reasonable certainty.'" Id. (quoting United States v. Doe, 488 F.3d 1154, 1159-60 (9th Cir.2007)). "While this is not a requirement approaching mathematical precision, a restitutionary award under § 2259 will be improper if the district court must engage in arbitrary calculations to determine the amount of the victim[s'] losses . . . ." Id. (internal quotation marks, citations, and internal ellipses omitted).

### III. DISCUSSION

The government suggests two alternative methods to calculate the amount of each victim's restitution award. The government first argues an "aggregate approach" should be utilized, in which Defendant is "require[d] . . . to pay restitution to the victims for the full amount of their losses." (Gov't Brief 6:17-18, 7:24-28.) The government argues:

> [t]his aggregate approach to liability is not only logical, it is perhaps the only viable framework for determining restitution in the case of federal child pornography offenses. Such offenses are rooted in the proliferation of the victims' images on the Internet, and that proliferation is caused by multiple actors, each of whom exacerbates the victims' injuries. This is particularly true in distribution cases.

(Id. at 6:17-20.) As an alternative approach, the government "proposes a two-step" formula. (Id. at 8:2-7.) "First, [the government] suggests that the court divide the pool of each victim's proven losses by the number of defendants convicted of possessing, receiving, or distributing their images." (Id. at 8:7-9.) The government argues:

> [t]his approach reflects the reality that many individuals have contributed to the victims' losses and seeks to distribute responsibility for the total amount of proven losses among the most culpable and readily-definable population of offenders (i.e., those who were convicted and thus

7

proven to have contributed to the victims' injuries).

(Id. at 8:9-12.) The government also argues that "[t]his approach will . . . ensure that the victims receive a steady stream of incoming payments over time from multiple offenders, which will help to achieve the restitutionary objective of making the victims whole." (Id. at 8:12-14.) "For the second step, the government proposes that the court impose an enhancement of three times these amounts given the nature of the defendant's offense" as a distributor. (Id. at 8:21-24.)

The victims argue that "[t]he Court could reasonably calculate and apportion the losses in three different ways." (Victims' Brief 2.) "First," the victims argue "[b]ecause this case (unlike Kennedy and many other cases) is a distribution case, [Defendant] should be held jointly and severally liable with all other defendants . . . [and t]he Court should . . . award Amy and Vicky restitution for the entire amount of their losses . . . ." (Id.) "Second," the victims argue "an award of at least [$150,000] is appropriate" under "Masha's Law, 18 U.S.C. § 2255." (Id. at 3.) "Third," the victims state that "[i]f the Court rejects [their] other arguments for calculating an award, the Government's [fractional share] approach is preferable to no award at all." (Id.)

Defendant opposes the award of any restitution on the current record. Defendant argues: "[n]othing in either Amy or Vicky's restitution packets provides this Court with any guidance on how to determine what specific amount of their losses are attributable to [Defendant's] conduct." (Def.'s Brief 10:13-15.) Defendant concedes: "[i]n light of the mandatory language in . . . Section 2259(a)[, he] believes the Court is obligated to order restitution." (Id. at 10:16-17.) However, Defendant contends:

8

> Based on the dearth of information regarding [his] conduct . . . and the fact that none of the information provided by [the victims] provides a method by which this Court can calculate the specific losses with reasonable certainty, [he] believes this Court's only option is to order further briefing with the direction that either the government or [the victims] show what their specific losses are as a result of [Defendant's] conduct.

(Id. at 10:18-23.)

The parties and the victims' arguments are addressed in turn below.

### A. Joint & Several Liability

The government and the victims have not shown that holding Defendant jointly and severally liable for the full amount of each victim's requested restitution is appropriate in this case. Neither the parties nor the victims have cited to a Ninth Circuit case in which joint and several liability was imposed in the context of a restitution award under § 2259, and the undersigned judge is unaware of any such authority. Further, other circuits have expressly declined to apply joint and several liability in that context.

As the Sixth Circuit recently stated in United States v. Gamble, 709 F.3d 541, 552 (6th Cir. 2013):

> 18 U.S.C. § 2259 is meant to ensure full restitution to the victim, understanding restitution in an expansive way. The statute is meant to hold the defendant responsible for the damage he caused, but not for damage he did not cause, as evidenced by the causation requirement. These purposes when considered together lead to the conclusion that liability is to be apportioned in a reasonable way that leads to full restitution, without eviscerating the causation requirement.
>
> Although placing the primary burden of total compensation on one defendant would give an appealingly simple meaning to the phrase "full restitution" in the statute and place the burden for collection on convicted criminals, it would

    indefensibly hold defendants responsible for losses they did not cause or only caused in a most attenuated sense, and shift the burden for coordinating contribution from the Government to individual defendants who are not well placed to seek contribution.

Gamble further states on page 553:

    [a]n apportionment system that spreads the effect of the penal goals of deterrence, retribution, and rehabilitation among the many convicted consumers of child pornography, while leading ultimately to the goal of full compensation for caused injury, fulfills the public purposes of restitution as described by the Supreme Court in Robinson.

  The Second and Eight Circuits have also recently declined to apply joint and several liability in the context of restitution awards under § 2259. See United States v. Hagerman, No. 11-3421-cr, 2012 WL 6621311, at *4 (2nd Cir. Dec. 20, 2012) (stating "the wording of section 3664(h) implies that joint and several liability may be imposed only when a single district judge is dealing with multiple defendants in a single case and does not contemplate apportionment of liability among defendants in different cases, before different judges, in different jurisdictions around the country") (internal quotation marks and brackets omitted); see also United States v. Fast, 709 F.3d 712, 723 n.6 (8th Cir. 2013) ("Because there is only one defendant in this case, section 3664(h) does not apply.")

  For the stated reasons, joint and several liability is not imposed.

**B. Masha's Law**

  The victims also have not shown that Masha's Law, 18 U.S.C. § 2255, should guide the Court's determination of the amount of restitution to award. "Title 18 U.S.C. § 2255 provides a civil remedy for personal injuries caused by sexual exploitation of children,

including violations of Section 2252." United States v. Yang, No. 1:09-CR-00168 AWI, 2010 WL 2011561, at *4 (E.D. Cal. May 19, 2010). "While Section 2259 concerns restitution, Section 2255 discusses damages. Restitution and the total amount of damages are not always the same thing." Id. at *5.

Since it has not been shown that § 2255's measure of civil damages is an appropriate measure of criminal restitution at issue here, it is not used.

### C. The Government's Proposed Two-Step Formula

The first step of the government's proposed two-step formula, i.e., "that the court divide the pool of each victim's proven losses by the number of defendants convicted of possessing, receiving, or distributing their images[,]" appears to be a workable method to determine the victims' losses with reasonable certainty. (Gov't Brief 8:7-9.) The Ninth Circuit contemplated the use of a "formula" to apportion a victim's losses in Kennedy. Kennedy, 643 F.3d at 1266 (stating "we do not rule out the possibility that the government could devise a formula by which a victim's aggregate losses could be reasonably divided"). Further, other circuits have approved of this method in determining restitution awards under § 2259. See Gamble, 709 F.3d at 553-54 (stating "the Government's proposal appears to be a pragmatic solution that the district courts may use as a framework" in awarding restitution under § 2259); see also Hagerman, 2012 WL 6621311, at *4 (finding the "approach to determining the proximate loss amount, on a per capita basis, to be reasonable").

However, the government has not sufficiently explained its reasoning behind utilizing the second step of its proposed formula, i.e., a three-time enhancement. "[P]icking a[n enhancement] number

without [sufficient] explanation is precisely the kind of arbitrary calculation" prohibited by Kennedy and will, therefore, not be used. Kennedy, 643 F.3d at 1265.

For the stated reasons, the Court adopts the first step of the government's proposed formula to determine the amount of the victims' restitution awards, as clarified by the Sixth Circuit in Gamble.

"As a preliminary matter, it should be clear that allocation will not apply when proximately caused harms are clearly traceable to a particular defendant. An example would be litigation costs in connection with the particular defendant." Gamble, 709 F.3d at 554. Any of these losses, including litigation costs and attorneys' fees, must be proven in connection with Defendant, specifically.

"For the harms that must be allocated, . . . the pool of [each] victim's provable losses that are not traceable to a single defendant" must be determined. Id. "As a logical matter, a defendant generally cannot cause harm prior to the date of his offense." Id.; see also United States v. Fast, 709 F.3d 712, 722 (8th Cir. 2013) ("[Defendant] did not possess any images of [the victim] until June 25, 2010. But she suffered losses before then. . . . [Defendant] could not have caused - and thus could not be liable for - losses before that date.") Therefore, any losses that predate Defendant's offense conduct will not be included in the pool of losses to be allocated.

Once each victim's pool of provable losses is determined, each victim's restitution award will be determined by dividing the pool by the number of standing restitution orders. Gamble, 709 F.3d at 554 ("In a situation involving a victim whose images have been widely disseminated and viewed over the Internet, the court may allocate losses

by dividing the pool by the number of defendants convicted of possessing the victim's image.").

### D. Calculation of Restitution Awards

Utilizing the above-described method, each victim's restitution is calculated as follows:

#### 1) Vicky

Vicky is requesting $1,335,369.30 in restitution, which comprises "$106,900.00 in future counseling expenses, $147,830.00 in educational and vocational counseling needs, $722,511.00 in lost earnings, $60,313.30 in expenses paid in out of pocket costs for the forensic evaluations, supporting records, court costs, and travel to meet with [counsel], and $297,815.00 in attorney's fees." (Vicky's March 22, 2013 Restitution Req. ("Vicky's Req.") at 1.)

##### a. Traceable Losses

Vicky's claimed out of pocket costs and attorney's fees are excluded since they have not been shown to be connected to Vicky's counsel's work in this action. Although Vicky's counsel provides a declaration in support of Vicky's request for attorney's fees, in which she declares that she has spent 850.9 hours in "direct representation" of Vicky, the referenced work occurred through January 31, 2012. (Decl. of Carol L. Hepburn ¶¶ 15-16, Ex. 11 to Vicky's Req.) Vicky's counsel was not notified that Vicky was identified as a victim in this action until June 27, 2012. (Victim's Brief 4.) Therefore, none of Vicky's claimed attorney's fees could have been incurred in connection with this case. Further, the majority of claimed litigation costs were incurred prior to June 27, 2012, and the costs that occurred after June 27, 2012, appear to be unrelated to this action. (Id. at ¶ 19.)

Since no evidence has been provided to enable the Court to determine what amount of attorney's fees or litigation costs, if any, have been incurred in connection with this specific action, none will be included in Vicky's restitution award.

### b.   Non-Traceable Losses

Vicky's non-traceable losses include future counseling expenses, educational and vocational losses, and lost earnings.

Vicky requests $106,900 in future counseling costs. This amount is based upon the expert opinion of clinical psychologist, Randall L. Green, Ph.D., that Vicky will require "therapeutic interventions for issues and symptoms related to her continued exposure to the Type II Trauma caused by her knowledge of the widespread and generally anonymous downloading of images of her victimization." (Psychological Status Report Summary at 7, Mar. 13, 2012, attached as Ex. 3 to Vicky's Request.) Dr. Green opined that Vicky's "[t]otal maximum range of estimated recommended interventions if followed and clinically indicated" totals $88,700 - $106,900. (Id. at 8.)

Instead of assuming $106,900 in future counseling costs, which represents the highest value of Dr. Green's estimated range, it is appropriate to use the average amount of this range, $97,800. Further, Dr. Green's values include $26,250 in individual psychotherapy sessions for 2009 - 2011, which predate Defendant's offense conduct. This amount must be deducted. Therefore, the total value of Vicky's projected future counseling that can be included in the "pool" of losses to be attributed to Defendant is $71,550.

Vicky requests $147,830 in educational and vocational losses. Vicky supports this request with the expert opinion of vocational consultant, Merrill Cohen. Ms. Cohen opines that Vicky's "knowledge and

understanding that [her] images . . . will persist in perpetuity has le[d] to significant psychological sequelae that impacts her education, career development, vocational situation, and earning capacity." (Vocational Assessment at 1, Mar. 10, 2010, Ex. 6 to Vicky's Request.) As a result of the referenced sequelae, Ms. Cohen opines Vicky will incur the following educational/vocational financial consequences:

- an additional semester of college ($11,148.00),
- an additional year to complete her planned Master's degree ($23,432),
- lost part-time wages while attending school because of Vicky's inability to both attend school full-time and hold a part-time job ($33,000),
- loss of earnings from 18 months delayed entry into the workforce ($76,500), and
- educational and career counseling ($3,750)

(Id. at 6-8.)

At the time Ms. Cohen completed her Vocational Assessment ("VA"), Vicky had not yet completed college. However, sometime in between the date of Ms. Cohen's VA and Vicky's March 22, 2013 restitution request, Vicky completed college. (Vicky's Request at 6 ("With great perseverance and despite setbacks [Vicky] has now finished her undergraduate degree and is looking ahead to graduate school.").) Since it cannot be determined whether Vicky completed college prior to the date of Defendant's offense conduct (October 26, 2011), the losses attributable to an additional semester of college and the part-time wages Vicky lost while attending college will not be included.

The total value of Vicky's projected vocational/educational losses that can be included in the "pool" to be attributed to Defendant

totals $96,182. This amount comprises $23,432 for an additional year of graduate school, $18,000 in lost part-time earnings during the three years of graduate school, $51,000 in the delayed entry into the workforce attributable to the additional year of graduate school, and $3,750 in rehabilitation counseling for educational and career planning.

Lastly, Vicky requests $722,511 in lost earnings based upon the expert opinion of economist Stan V. Smith, Ph.D. Dr. Smith "has calculated the loss of earnings attendant to the delay in entry into the work force and the predicted recurrent interruption in her work life that the need for therapy and periodic triggering of her panic and anxiety over the presence of her images on the internet." (Vicky's Request 6; see also Dr. Smith's Economic Assessment, Nov. 10, 2010, attached as Ex. 8 to Vicky's Request.) It appears that Dr. Smith's wage loss calculations begin in 2012, after Defendant's offense conduct. Therefore, the full value of Vicky's claimed "loss of earnings capacity" can be included in the "pool" of losses to be attributed to Defendant.

### c. Allocation

The "pool of [Vicky's] provable losses" totals $890,243 ($71,550 in future counseling, $96,182 in vocational/educational losses, and $722,511 in lost earning capacity). After dividing this amount by the number of standing restitution orders for Vicky (309)[3], the amount of Vicky's losses that can be attributed with reasonable certainty to Defendant is $2,881.05.

### 2) Amy

Amy is seeking $3,367,854 in restitution. This amount comprises $512,681 in future counseling, $2,855,173 in lost income,

---

[3] (See Gov't Brief 8:16-18.)

16

$17,063 in expert witness fees, and $3,500 in "estimated" attorney's fees. (Amy's Mar. 22, 2013 Restitution Req. ("Amy's Req.") at 51.)

### a. Traceable Losses

Amy's attorney states in Amy's March 22, 2013 restitution request: "Amy's attorney's fees as well as other costs incurred in this case are not yet finalized but are estimated to be approximately $3500." (Amy's Req. at 51.) However, Amy's attorney does not provide a declaration or any other documentation evincing the hours he has expended in connection with this case, and he has not provided any information concerning the amount he charges per hour.

Also, Amy's claimed expert fees of $17,063 are not documented in a manner that enables the undersigned judge to determine which expert fees, if any, can be attributed to this action. For example, Amy states that economist Stan V. Smith, Ph.D.'s expert fees total $6,105; however, Dr. Smith's Economic Assessment ("EA") was conducted in 2008, three years before Defendant's offense conduct. (Id.; see also, Dr. Smith's EA, attached as Ex. 3 to Amy's Request.) Also, Amy claims miscellaneous expenses totaling $258 without providing any information concerning when, or in connection with what litigation, the expenses were incurred. (Id.)

### b. Non-Traceable Losses

Amy's non-traceable losses include future counseling expenses and lost earnings.

Amy requests $512,681 in future counseling costs. This amount is based upon economist Stan V. Smith, Ph.D.'s calculations, which were "based upon [his September 13, 2008] interview with [psychologist] Dr. Joyanna Silberg . . . ." (EA at 1, 3-4.) Dr. Silver states: "It is my understanding that [Amy] will require counseling for the remainder of

her life[,]" and he estimates "counseling costs at one hour per week at $150 per hour, which is $7,800 annually." (Id.) Dr. Silva's calculations also include the cost of "three institutionalizations during [Amy's] lifetime . . . , which range from $30,000 to $50,000 per institutionalization . . . ." (Id. at 4.) However, additional information in the record evinces that Dr. Smith's calculations are based upon outdated information.

Dr. Silberg prepared four Psychological Assessments ("PAs") of Amy: the first on November 21, 2008, the second on October 21, 2010, the third on January 23, 2011, and the fourth on October 22, 2012. (Dr. Silberg's PAs, attached as Ex. 2 to Amy's Req.) At the time of Dr. Silberg's first PA, Dr. Silberg opined that Amy would "require weekly therapy, and [that] it [wa]s likely there w[ould] be periods where more intensive inpatient or rehabilitation services will be required over the course of her lifetime." (Dr. Silberg's Nov. 21, 2009 PA at 10.) However, by the time of Dr. Silberg's last PA, she opined that Amy was "much improved, and her life [had] significantly stabilized since her [last] evaluation . . . ." (Dr. Silberg's Oct. 23, 2012 PA at 1.) Although Dr. Silberg continued to recommend "[c]ontinued treatment[,]" she did not indicate a need for future inpatient services. Further, Dr. Silberg stated that Amy's therapy had "phased down to once a month." (Id. at 1.)

Therefore, the only future counseling costs that can be included in the "pool" to be attributed to Defendant consist of monthly counseling sessions for Amy's life expectancy beginning in 2012, which totals $104,400 ($150 / session x 12 months x 58 years[4]).

---

[4] Dr. Smith calculated Amy's future counseling through 2070. (continued...)

Amy requests $2,855,173 in lost earning capacity based upon Dr. Stan Smith's economic projections. Dr. Smith calculated Amy's lost earning capacity based upon wage data for non-Hispanic, white female college graduates. (EA at 2.) Dr. Smith's wage loss calculations begin in 2011, the year of Defendant's offense conduct. Therefore, the full value of Amy's claimed "loss of earnings capacity" can be included in the "pool" of losses to be attributed to Defendant.

### c. Allocation

The "pool of [Amy's] provable losses" totals $2,959,573 ($104,400 in future counseling and $2,855,173 in lost earning capacity). After dividing this amount by the number of standing restitution orders for Amy (171)[5], the amount of Amy's losses that can be attributed with reasonable certainty to Defendant is $17,307.44.

## IV. CONCLUSION

For the stated reasons, Vicky is awarded $2,881.05 in restitution, and Amy is awarded $17,307.44 in restitution. Therefore, the judgment shall be amended in accordance with this ruling.

Dated: April 15, 2013

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

---

[4](...continued)
(EA, Table 7.) 58 years is the number of years between 2012 and 2070.

[5] (See Gov't Brief 8:18-20.)

19